*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GUTZMAN, Minors.

UNPUBLISHED
December 08, 2025
8:49 AM

No. 374203; 374204
Alpena Circuit Court
Family Division
LC No. 21-007604-NA

Before: YATES, P.J., and BOONSTRA and YOUNG, JJ.

PER CURIAM.

Respondents Austin Gutzman and Monica Carnes are the biological parents of the three minor children: PG born in 2020, CG born in 2021, and GG born in 2023. Respondents appeal as of right the termination of their parental rights to their children following the four-year pendency of this case in which they were temporarily but impermanently able to bring their house up to habitability. Throughout the case, respondents would inconsistently avail themselves of the services that petitioner, the Department of Health and Human Services (DHHS), offered or provided. The trial court recognized that while respondents loved their children and made modest progress by the end of the case, respondents had not shown that they had rectified, or could rectify, their underlying problems. We affirm the circuit court's order terminating respondents' parental rights.

## I. BACKGROUND

Respondents and PG lived together at their home in Alpena, Michigan. Children's Protective Services (CPS) first received a complaint in August 2020 when PG was three months old, alleging respondents' home was dirty, smelled of rotting food and mold, was littered with garbage and cigarette butts, and that respondents were using marijuana in PG's presence. Respondents were unmarried and both 20 years old at the time. Several interventions including Families Together Building Solutions (FTBS), Early Head Start, and WIC assisted the family in purchasing a washing machine, electric stove, Walmart gift cards, 10-yard dumpsters, smoke and

-1-

carbon monoxide detectors, paint and cleaning supplies, and baby supplies. FTBS made efforts to teach respondents to how clean their home and provide a safe environment for PG.

## A. FIRST REMOVAL

In October 2020, the home was still in a "deplorable condition" and PG was removed from the home. CPS continued monitoring and providing respondents with a to-do list for cleaning and organizing the home. Respondents brought their home up to habitability in February 2021, and PG returned to their care. Respondents welcomed CG in May 2021, and the home returned to an unacceptable condition again by the end of the summer; the kitchen "sink and cupboards were full of dirty dishes . . . , garbage throughout the kitchen, and flies everywhere." CG was underweight and experiencing seizures.[1] On September 8, 2021, respondent-mother took CG to a hospital in Saginaw, where it was reported his car seat and toys were soiled, he had dirt caked into his skin folds and extremities, and respondent-mother was "disengaged and on her phone."

## B. SECOND REMOVAL

On September 10, 2021, after efforts were made to prevent PG and CG's removal from respondents' home, DHHS filed a petition to remove the children and place them in DHHS's care and custody, providing the following reasons why residing in respondents' home was contrary to the children's welfare:

> the parents' unwillingness to cooperate with Families First to reduce and eliminate significant safety concerns in the home; the home environment due to dangerous objects and substances (marijuana and "Dabs," glass bongs, razors and knives, butane and propane torches – dangerous due to risk of explosion), and refusal to move other dangerous items like a large fish tank on top of a dresser that [PG] has been climbing on; parents' unstable mental health and inability to manage emotions appropriately for the health and safety of the children; parents' inability to prioritize the needs of the children over their own (having multiple people moving in and out of the home, frequent partying, leaving children in their cribs while they are awake so parents/adults do not have to supervise); . . . inability to manage finances effectively; and current health concerns for [CG] (underweight, seizures).

The petition also cited multiple animals lived in the home and contributed to the unsanitary environment, including: ducks, a large bird, turtles, lizards, a tarantula, a snake, mice, rats, two pit bull dogs that fought with one another, and several cats. Families First was no longer willing to work with respondents because they were "extremely argumentative, belligerent, and disrespectful." The trial court held a hearing at which respondent-mother testified CPS caseworkers were not responsive, and that she made many improvements to the home such that many of the conditions listed for removing the children were no longer present. Respondent-mother also alleged a CPS caseworker "lunged at" respondent-father. Respondent-father testified he was working with CPS, and this presented a challenge because it required him to lose hours and money at work. He also admitted: "I am known to be pretty hot-headed." The trial court

---

[1] The record later established there was a family history of seizures.

authorized the petition on September 10, 2021, removed PG and CG from respondents' care, placed the children in foster care with Tina and Timothy Ratz, and ordered supervised parenting time and video visits for respondents.

At subsequent status conferences, respondents complained they were not getting enough video visits with or pictures of the children. Respondent-mother complained it took 24 hours for caseworkers to respond to her messages asking about the children, and that caseworkers were not responsive on the weekends. A foster care supervisor explained this was due to limited staff. The trial court reminded respondents to be patient, but ordered DHHS to accommodate at least one video visit on the weekends, and asked that foster care workers respond to respondents' text messages sooner. The children's lawyer guardian ad-litem (LGAL) testified in October 2021 that she "couldn't believe how happy these children are" in foster care.

At a December 9, 2021 hearing, DHHS caseworker Tiffany Eddinger testified that respondents were still uncooperative and aggressive with caseworkers, and this was a barrier to DHHS being able offer services to achieve reunification. Regarding whether the conditions of the home which led to the children's removal had been rectified, Eddinger testified that while "the home has been picked up," a used marijuana joint remained on the living room floor and posed a safety risk to the children. The trial court agreed that respondents were aggressive and difficult with caseworkers, but the court opined that if the home was no longer unsafe, the children should be placed back with respondents. By December 22, 2021, DHHS recognized respondents had "made a lot of progress" with cleaning the home and gave them "a lot of credit for the work that they have done." DHHS agreed the children could return to respondents' home for the Christmas and New Year holidays, and allowed unsupervised weekends overnight at respondents' home, with visitation during the week, subject to random drop-in home visits by DHHS to ensure respondents were maintaining a clean and safe home.

In January 2022, DHHS asked that the children be removed again because, although much of the house was clean and appropriate, there were marijuana pipes and a propane tank on the enclosed front porch that posed a fire hazard. CPS caseworker Alisha Allen testified that she advised respondent-father to not smoke marijuana in the same room as the children. City of Alpena Fire Marshall Andy Marceau testified that he visited respondents' house and was "terribly" worried about them smoking on the enclosed porch, which was inadequately ventilated and located such that a fire would go directly up the stairwell into the children's sleeping area. The smoke and carbon monoxide detectors that Marceau previously installed in the bedrooms were missing, so Marceau replaced them. He opined that the safest place to smoke would be outside and respondents agreed to a fire-safety plan. Respondent-father also picked up a cigarette butt receptacle and fire extinguisher from Marceau to bring respondents' home into compliance. Respondent-mother testified that since Marceau's visit, respondents moved their smoking area into the basement. The trial court agreed the children should be returned to their home by the holidays, and DHHS could visit unannounced to ensure respondents were complying with safety plans and recommendations.

## C. THE TRIAL COURT TAKES JURISDICTION OVER THE CHILDREN

CPS caseworkers attempted visits to the home on March 2 and March 16, 2022, but no one was home. They contacted respondent-mother, who informed them the family moved to Hubbard

Lake while the home's only bathroom was being renovated. Respondent-mother refused to disclose where in Hubbard Lake the family was staying and caseworkers were not able to verify the children's wellbeing. On March 22, 2022, respondents allowed entry into their home in Alpena. Caseworkers reported the home was again uninhabitable because the only bathroom in the home was disassembled, the home was full of clutter and animal feces, an unapproved person was sleeping and doing drugs in the bedroom opposite CG's bedroom, cat feces were on the floor in CG's bedroom, there was broken glass on the kitchen floor, and one of the children was drinking from a visibly moldy sippy cup. The former foster care placement for the children, the Ratzes, reported that respondents were asking them to permit the children to stay with them. Respondents pleaded to the allegations in the petition that their home was unclean and unsafe and the trial court took jurisdiction over PG and CG under MCL 712A.2(b), but the children remained living in respondents' home.

Respondents entered into and began complying with a parent-agency treatment plan (PATP), which included parenting classes, individual mental health counseling, supervised visitation, and lessons in cooking and maintaining a clean home. Respondent-father stated he worked from 6:00 a.m. to 10:00 p.m. almost every day to provide the necessary financial support required of him under the PATP, and expressed difficulty with having time to meet with caseworkers. DHHS remained concerned with respondent-father's anger and difficulty coparenting.

Respondents also received psychological evaluations in June 2022 and while neither was diagnosed with an intellectual disability, Psychologist Dr. Don Boyd determined both respondents required counseling. Respondent-father had significant intellectual deficits that affected his reasoning skills, and he had a life pattern of impulsiveness and negative reactions to stressors, which was reflected in his propensity for anger and acting out in response to frustration with complexity or anxiety. Respondent-mother's intellectual functioning was in the "low-average" range, and she suffered from anxiety, "difficulty with acting independently as her own agent," an inability to make plans or decisions, and a propensity for becoming overwhelmed, which was exacerbated by respondent-father's tendency to withdraw from her when there was any conflict. Dr. Boyd opined respondents engaged in "a devastating cycle" in which their respective limitations aggravated each other so that "the whole household fell apart for lack of structure."

Respondents were referred to couples counseling and to the Healthy Families of America (HFA) Day One Program. The HFA program offered respondents with in-home lessons on cooking, parenting, and cleaning skills. DHHS believed that respondents needed "just a little bit more in-depth [work] in the home," but otherwise recommended waiting a few more months to see if respondents could sustain their progress before closing the case.

But by July 13, 2022, DHHS caseworkers observed excessive flies in respondents' home, and provided respondents with fly strips and bleach, which did not seem to work. The house again accumulated clutter, dirt, animal feces, accessible drug paraphernalia, and grime. On July 26, 2022, DHHS caseworkers personally helped respondents clean their living room and dining room, and provided them with a mop, grocery money, information for food pantries in the area, and Goodwill vouchers. Despite these efforts, the children showed up to respite care dirty and hungry. By August 2022, respondents had not begun participating in the HFA program despite HFA attempting to schedule visits. Respondents also denied DHHS workers access to the home during

unannounced visits. During the times they allowed DHHS workers in, DHHS observed respondents were still using marijuana in the same room as the children, PG had picked up a used marijuana joint off the floor and put it in her mouth, and there were animal feces in the children's playroom. PG also arrived to respite care in September 2022 with "big bites," which respondent-mother said were from fleas. Respondent-mother said she "treated the house." PG and CG were "very dirty and upset" when they arrived to respite care.

In late September 2022, DHHS filed a supplemental petition to remove PG and CG from respondents' home, citing the events from the last few months as reasons for why it was contrary to the children's welfare to remain with respondents. Attached to the petition were text messages between respondents and DHHS caseworkers, wherein respondent-father used foul language, and expressed his distrust of and frustration with the caseworkers and services. He stated he would not allow anyone into the home if he was not there, and accused caseworkers of "get[ting] a paycheck from taking my kids." In response, the trial court ordered respondent-father to start mental health counseling within 30 days, but did not remove the children from respondents' care.

In October 2022, the children attended a local daycare. When asked about the children's cleanliness, the owner of the daycare testified "over all the years I have been in[] daycare, this one is the worst I have ever seen," and that "[o]ne of my staff members brushed one of the children's hair" and the brush "was so black because of the filth that came out of her hair." She added, "they have a smell that was just over the top when they come in." The children's feet were black, and the daycare owner believed "old poop" was caked onto the bottom of their feet, as if they were "walking barefoot over filth." Eventually, the children were excluded from that daycare because of respondent-father's anger issues and vulgarity when interacting with the daycare owner.

An HFA Day One worker testified that on November 8, 2022, she encountered a deer carcass and an electric heater in respondents' bathtub. Caseworkers attempted to visit respondents' home on November 11, but respondents barred them from entry, and they returned on November 16, but were not allowed into the bathroom. They reported the home was cluttered and had a strong odor, and the children were very dirty, they were licking milk off an unclean floor, and CG was carrying a pumpkin-carving knife. Respondents admitted that there were two other people and a large number of animals living in the home. Respondents had also missed three of CG's last doctor's appointments.

## D. THIRD REMOVAL

On December 7, 2022, DHHS filed another supplemental petition to remove the children and this time, the trial court granted it because respondents had not complied with the safety plan, were not keeping the house sufficiently sanitary, respondents' house was too crowded and was unsafe, and respondents were not adequately addressing their mental health problems. The children entered foster care with the Ratzes, and the trial court continued to allow unsupervised parenting time on the condition that respondents allowed DHHS caseworkers to inspect the home before the children were allowed entry.

One week later, caseworkers visited the home and found it to be "the cleanest that [they] have ever seen that home." Respondents got rid of most of their animals, agreed to a new safety plan, and caseworkers recommended that respondents receive overnight visits with the children

while respondents were monitored to see if they could continue their progress. The trial court agreed with that recommendation and by January 2023, respondents' house was still in good condition. The trial court commended respondents' progress, but it was not yet ready to return the children given respondents' history of allowing their home to return to a dirty and unsafe environment.

By March 2023, the children were consistently staying with respondents during the weekend and some week days, but caseworkers remained concerned about the possibility of respondents becoming overwhelmed, and the home decaying and becoming unsafe, if the children returned to their care fulltime. The clutter in the house was "not horrible," but there was still an extremely bad odor from animal urine and feces. Respondent-father testified a sewage pipe burst in the house. Caseworkers observed that when the children were with their foster parents, they were outgoing, playful, and sought comfort from the foster parents. At respondents' home, caseworkers said they did not observe the same outgoing and playful behavior. Although the children sought respondent-mother's attention, they did not seek any attention from respondent-father. The children's LGAL testified that when she visited respondents' home, respondent-father was "hostile and angry" toward her. She opined this behavior was not safe for the children. The trial court opined it was still contrary to the children's welfare to be returned to respondents' full time care. The trial court ordered that respondent-mother could have unsupervised parenting time, but until respondent-father could prove that he was attending counseling and able to control himself, his parenting time would be supervised.

By June 2023, respondent-mother had attended three out of eight scheduled counseling appointments, and respondent-father conducted a counseling intake but did not follow up. Respondents moved out of their home in Alpena and moved into a different home in Alcona County, leaving their animals behind. Their previous home had been declared uninhabitable. The new home was infested with cockroaches, so DHHS caseworkers requested the children stay with the Ratzes until this could be resolved. When Tina Ratz went to pick up the children from respondents, things escalated to an "altercation" during which the children ran to Tina, who had to remove the children.

E. RESPONDENTS WELCOME A THIRD CHILD

In August 2023, respondents' youngest child, GG, was born. DHHS filed a petition seeking removal of GG in Alcona County, and the matter was transferred to Alpena County. Respondents pleaded to jurisdiction as to GG. By that time, respondent-father was interacting more positively with caseworkers, however, he was still unable to provide proof that he attended counseling by September 2023. DHHS caseworkers testified respondents' new home seemed fairly clean. Respondent-mother was also receptive to services. The trial court ordered respondent-father could have unsupervised parenting time visits because he demonstrated improvement.

One month later, respondents were having regular unsupervised parenting time with the children without concerns, and their house continued to remain fairly clean and safe for the children. The LGAL opined that the children loved respondents, and the LGAL was "blown away in a positive way" that respondents were keeping their house clean, but respondents were still

demonstrating some difficulty regulating their emotions. The children returned to respondents' care on December 1, 2023.

Less than one week later, respondent-mother drove into a ditch with the children in the car. Tina Ratz came to get the children, and reported PG had a red mark on her eye and on her arm, and PG reported that respondent-mother had slapped her "because I'm a bad, bad baby." A caseworker opined that respondent-mother seemed overwhelmed by the children. Petitioner filed a supplemental petition to remove the children on December 19, 2023, but the parties then stipulated to withdraw that petition after a new caseworker was assigned and had successfully interacted with respondent-mother and the Family Reunification Program (FRP). The new caseworker, April Burkhardt-Watson, testified that CG was being fitted for a helmet because his head was misshapen, she had been at respondents' home and found it to be in good condition, and she believed she had a good rapport with respondents.

By April 2024, Burkhardt-Watson was concerned that respondents' new home was deteriorating again because there was trash and debris in the yard, and there was an accumulation of dirty laundry inside the home, although respondents made some improvements after Burkhardt-Watson brought the issues to their attention. The house had also flooded. FRP discontinued their services because of respondents' noncompliance and failure to benefit—respondent-mother would end visits early, reschedule visits, become frustrated and argumentative with caseworkers, and would not attempt to implement FRP's parenting techniques. Burkhardt-Watson opined respondents were resistant to suggestions, they did not perceive any problems with their behavior, they were unmotivated to make any changes, and they became argumentative when discussing the possibility that the children could be removed.

In June 2024, Burkhardt-Watson testified DHHS held a meeting at which it attempted to explain the need for the safety plan, but because respondent-father was "argumentative," and displayed "aggressive and hostile verbal behavior, the meeting had to be ended early, and we were not able to accomplish anything." Respondent-mother explained that the house deteriorated because she was depressed and overwhelmed and responsible for everything. Burkhardt-Watson testified that since December 2023, the house had developed a strong and unidentifiable odor that saturated clothing and hair and could be detected from outside the house, the children's bedding was soiled, and the children were filthy. Burkhardt-Watson opined that the uncleanliness of respondents' house remained a barrier, respondents had not shown any benefit from parenting education, and, primarily, respondents' mental instability remained a barrier. Burkhardt-Watson noted that respondent-father was aggressive and verbally abusive toward respondent-mother, and Burkhardt-Watson suspected that domestic violence might be occurring.

## F. FOURTH REMOVAL

On June 27, 2024, petitioner filed a supplemental petition to terminate respondents' parental rights. The trial court ordered the children be placed with the Ratzes; it granted respondent-mother unsupervised parenting time, and it granted respondent-father supervised parenting time because he had not complied with mental health services.

By October 2024, respondents told Burkhardt-Watson that they were no longer in a relationship, and then that they had resumed their relationship. Respondents claimed to be

attending counseling, and they provided a video showing their house was clean. However, Burkhardt-Watson was concerned about respondents' historical inability to maintain the house. Respondent-father largely refused to communicate with Burkhardt-Watson and remained "combative." Respondents had filled two dumpsters with trash, but their basement still needed to be cleaned. Burkhardt-Watson recognized that respondent-father had a busy work schedule, but she opined that he needed to make time for his children as well, and DHHS tried to accommodate his schedule. When respondent-father attended visits, he interacted with the children appropriately but during one visit, he tried to call Burkhardt-Watson's supervisor 17 times and tried to call his attorney several times, and the visit ended early because he was unwilling to spend time with the children.

## G. TERMINATION HEARING

The trial court held a termination hearing on December 13 and December 16, 2024. Burkhardt-Watson testified on behalf of DHHS that respondents were often hostile and volatile when workers and service providers attempted to engage with and help them, but that respondent-mother was generally better able to communicate. Burkhardt-Watson scheduled a budgeting meeting around respondent-father's work schedule, and he indicated that he would be available, but then he did not show up. Burkhardt-Watson testified that respondent-mother told her on several occasions that she was depressed and tired of respondent-father belittling her, calling her names, and making her feel stupid, both when they were together and when they were separated. Burkhardt-Watson opined that "couples counseling has been an ongoing need since the onset of this case," and "they both needed to parent the children." Burkhardt-Watson supervised a number of parenting time sessions with respondents, and she opined that they were generally appropriate, respondents and the children showed affection for each other, and she had no doubt that respondents loved the children and that the children loved respondents. She believed that respondents were able to "be safe with the kids for a couple hours," but parenting required more than that. Burkhardt-Watson opined that respondents both had difficulty putting the children's needs ahead of their own, including failing to provide food or medical needs, such as their failure to use the helmet to reshape GG's head. Respondent-mother repeatedly told Burkhardt-Watson that the declines in the cleanliness of the home were because respondent-mother was depressed or overwhelmed.

Burkhardt-Watson conceded that when she visited respondents' home in November 2024, she would not have sought to remove the children on the basis of the conditions she observed. However, she testified there was a pattern: the condition of respondents' home improved after the children were removed and then when the children were welcomed home, the condition of the home rapidly declined, and the children would be removed again. She opined that respondents did not seem to take responsibility for their conduct or demonstrate long-term benefit from DHHS services. Respondents showed that they could make progress, but "[t]hey just keep repeating things." Burkhardt-Watson believed that, despite respondents' improvements and bond with the children, it was "not fair to the kids to keep going through these cycles as well."

Timothy Ratz testified that when the children first came into the Ratzes' care, some of their initial interactions with respondent-father were poor, and respondent-father was upset and used "a lot of bad language," but "that went away pretty quickly" and he had otherwise interacted well. Licensed professional counselor Peggy Briggs began seeing respondent-father as a client in

September 2023, and she saw him a total of eight times in 2023 and 2024. Briggs observed that respondent-father had a very high evaluation score for trauma – CPS was involved with his family when he was a child. CPS workers treated him poorly as a child, which traumatized him. Briggs worked with respondent-father regarding healthy responses to anger, and described respondent-father as "enthusiastic" about addressing his anger. Briggs opined that respondent-father showed improvement, but he still had work to do and would benefit from more frequent sessions.

Nickole Stein-Fisher testified that she was a clinical therapist who began seeing respondent-mother for individual therapy in August 2024. They were working on communication, anger management, and coping skills. Respondent-mother consistently attended telephone appointments but did not seem to grasp concepts or seemed to be distracted because she was at work or in her car; Stein-Fisher opined that respondent-mother displayed minimal benefit. Respondent-mother testified that she had a lifelong distrust of therapists but that she had learned from Stein-Fisher and intended to pursue further therapy with someone she could see in person.

Pamela Tippman and Kathrine Cutright were family reunification workers. Tippman began working with respondents in their home when the children were returned in December 2023, to help them maintain a clean home and transition the children back home. Initially, respondents cancelled visits, and thereafter, usually only respondent-mother was present. Respondent-mother was engaged during some visits, and during others she was uncooperative, distracted, or clearly disinterested, complaining that she was overwhelmed. Regarding discipline, Tippman told respondent-mother not to spank the children, and in response, respondent-mother protested "that nothing works with her kids" and that she did not know what to do. Cutright offered personally to help respondent-mother scrub the floors, do the dishes, and fold the laundry. Respondent-mother was initially "totally on board with it, and then she canceled" and would not permit Cutright to reschedule or come over.

Diane Rocheleau, the FRP supervisor, testified that respondent-mother was friendly and welcoming, but frustrated and overwhelmed. Rocheleau testified that respondent-father was distrustful of DHHS and of Rocheleau's team, but they reached an agreement for a third party to attend meetings as a witness. Rocheleau attempted to accommodate respondent-mother's complaint that she could not take in all the information she was being given by developing visual aids for respondent-mother. Rocheleau told respondents that they were available at any time of day and any day of the week, but respondents never took up Rocheleau's offer.

Foster care supportive visitation worker Amy Will provided services to respondents between July and November 2024. Will opined that respondents both wanted what was best for their children but that there were "some kind of festering issues" between each other—she believed that respondents were generally appropriate with the children and that the children were bonded with respondents. Will noted that the children were very polite, and that respondents used timeouts and explanations appropriately to discipline the children.

Brianne Kimball testified that she worked for the Small Wonders Academy childcare center, where the children had attended since January 2023. Kimball observed that when the children were upset or were excited, they asked for the Ratzes rather than respondents. Kimball testified that PG relayed that respondents yelled, GP cried all the time, and respondents did not take care of GP.

Several of respondents' relatives or friends testified on their behalf, stating that respondents and the children clearly loved each other and were bonded to each other. They opined the home was at most cluttered but not filthy, that respondents never argued in front of the children, and only bickered occasionally. They acknowledged respondent-father's propensity to anger, but that he improved "like night and day." They stated that other than when respondent-father was interacting with caseworkers, he was kind and had never acted in a confrontational manner.

Finally, respondent-mother testified. She showed photographs of the present state of her house, which was clean. Before the first day of the termination hearing, respondents attended an online parenting education course. Respondents also finalized a budget together the night before the second day of the termination hearing. On the second day of the termination hearing, respondent-mother testified that respondents had just signed up for a couples-therapy course—she agreed that couples counseling had been suggested earlier, but she denied that DHHS ever provided her with a referral or even names or phone numbers for such services. Respondent-mother testified that she believed the children would be safe with her because she now realized that she had a lot of people who were willing to help her, and she knew to ask for help if she was starting to fail.

## H. TRIAL COURT'S FINDINGS

In an 18-page opinion, the trial court made factual findings regarding the barriers to family reunification that went unaddressed, or incompletely addressed, after years. Specifically, the court noted that respondents failed to maintain a stable, clean, safe living environment for their children despite the services, involvement, and oversight from DHHS. Respondents did not meaningfully participate in family reunification services and were unable to maintain their house in a safe condition for a sustained period of time, so their home environment remained a substantial risk of harm to the children. The trial court also noted the inconsistent medical treatment offered to the children, and ongoing substance use in the presence of the children, were barriers to reunification.

The trial court recognized that respondents started benefitting from mental health services in the few months before the end of the case, but it found that any short-term progress they made in those few months "cannot unwind the parents' failure to substantially benefit from services since disposition and/or for the duration of this case." It held that respondents failed to rectify the conditions that led to adjudication and that there was a reasonable likelihood that the children would be harmed if returned to respondents' care.

As to the best interests of the children, the trial court weighed the children's bond to respondents against termination, but the bond they had to their foster parents supported termination. It found respondents minimally engaged in parenting services and had not demonstrated that they benefited or could provide long-term safe parenting, which weighed in favor of termination. The trial court determined termination was in the children's best interests because they were young, vulnerable, and in immediate need of permanence in a safe home environment, which the foster home could provide but which respondents were unable to provide for more than brief periods, weighing in favor of termination. The trial court entered an order terminating respondents' parental rights. Respondents now both appeal.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondents first argue that the trial court erred in finding that a statutory ground for termination under MCL 712A.19b(3) was proven by clear and convincing evidence. We disagree.

To terminate respondents' parental rights, the trial court must have found at least one of the statutory grounds for termination in MCL 712A.19b(3) proven by clear and convincing evidence. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012); *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The trial court's factual findings are reviewed for clear error and will be upheld unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts*, 297 Mich App at 40-41 (quotation marks and citation omitted).

While the trial court only cited MCL 712A.19b(3) broadly, it referenced respondents' failure "to rectify the conditions that led to adjudication," their failure to comply with and benefit from services and failure to rectify other barriers to reunification, and a "reasonable likelihood that the children would be subjected to a substantial risk of harm if they were returned to their parents [sic] care." This matched the language of MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(c)(*ii*), and MCL 712A.19b(3)(j), which provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

## A. MCL 712A.19b(3)(c)(*i*)

Termination of parental rights is proper under MCL 712A.19b(3)(c)(*i*) when "the totality of the evidence amply supports that [the parents] had not accomplished any meaningful change in the conditions" that led to the court taking jurisdiction over the minor, *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009), and it is unlikely "that the conditions will be rectified within a reasonable time considering the child's age." If a parent has complied with services and made meaningful efforts, then that could break a historical pattern. *In re Mason*, 486 Mich 142, 162-163; 782 NW2d 747 (2010).

In this case, the dispositional order taking the children into protective custody was entered on March 22, 2022, and the circuit court entered the termination order on December 20, 2024; thus, the requirement that 182 or more days elapsed since the issuance of the initial dispositional order was met. MCL 712A.19b(3)(c). Under respondents' plea, the conditions that led to adjudication were that their house was unclean and unsafe for the children to live, including that it had drug paraphernalia accessible to the children, and had several animals. Respondents argue on appeal that the circuit court erred when it found there was no reasonable expectation that respondents would be able to provide a safe home environment for their children. They argue their home was clean and was in a condition that all parties agreed on the record was acceptable for the minor children to live in by the time of the termination hearing. According to respondents, the conditions that led to the adjudication no longer existed.

Respondents' efforts in engaging in mental health treatment, completing the Foster Care Supervised Visitation program, removing most of the animals, and bringing their home up to habitability multiple times, were commendable. However, respondents were unable to sustain a safe home environment for their children or meaningfully benefit from any of the programming offered by DHHS in the almost four years since CPS became involved with the family. Each time respondents cleaned their home and their children were welcomed back in, their home would deteriorate to the same, if not worse, uninhabitable condition it was found in at the time of respondents' plea. Further, respondents were given several safety plans to keep drug paraphernalia inaccessible to their children, but continued to disregard the safety plans, which posed a risk of harm to the children.

Although respondents began attending individual counseling and seemed to benefit from this mental health treatment, they had greater challenges with maintaining a safe home environment and DHHS would still require a lengthy period of assessment, counseling, and supervision before it could consider recommending that the case be closed. Each time respondents were close to reunification, their home would again become unclean and unsafe, which required the children to be removed. CPS had been involved with respondents since PG was three months old, and by 2024, PG was approaching school age. PG was removed four times, and each time, respondents were unable to prove they could keep the home environment safe for their children.

Given the length of time and number of interventions tried across the board, there is clear and convincing evidence that supports the trial court's reliance on MCL 712A.19b(3)(c)(*i*) that the home will not become clean and safe within a reasonable time.

## B. MCL 712A.19b(3)(c)(*ii*)

During the pendency of this case, other conditions became plain to DHHS that also went incompletely or totally unrectified. There is evidence respondents' relationship with each other began to deteriorate after GG was born. They often fought and yelled at each other in their children's presence. DHHS referred respondents to couples counseling in June 2022, but respondents participated in their initial consultation on the second day of the termination trial in December 2024. Respondents also struggled attending to their children's medical care, missing several of CG's doctor's appointments, and not requiring GG wear a head reshaping helmet. On balance, as DHHS responded to each new-occurring problem, respondents mostly did not participate in offered services to make meaningful changes. The trial court was correct to state respondents were capable of safely and effectively parenting the children for brief periods of time but could not show a long-term ability to achieve an emotionally stable or safe living environment. Thus, the trial court did not clearly err by finding that respondents had not rectified other conditions which came to the forefront after their plea, and that they could not do so within a reasonable time given the children's ages.

Because respondents failed to rectify the conditions that led to adjudication, and other conditions that arose after adjudication, and could not rectify those conditions within a reasonable time, we need not consider whether there was a reasonable likelihood of harm if the children were to be returned under MCL 712A.19b(3)(j). See *In re Olive/Metts*, 297 Mich App at 40 (the trial court need only find one statutory ground for termination in MCL 712A.19b(3) was proven by clear and convincing evidence).

## III. BEST INTERESTS

Respondents next raise the issue that the trial court did not properly consider the best interests of the children, but they offer no substantive argument to support their argument. We could choose to consider this issue abandoned, but we will nevertheless briefly explain why we affirm the trial court's best interests findings. *In re Conservatorship of Murray*, 336 Mich App 234, 260-261; 970 NW2d 372 (2021).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. With respect to the children's best interests, this Court places its focus on the children rather than the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

Many times throughout this record, DHHS caseworkers and other service providers from various programs testified respondents clearly loved their children, and that the children were bonded to them. The trial court appropriately considered this weighed against termination. However, it also appropriately considered that the children were bonded to their foster parents,

-13-

who could eventually adopt them. "[W]hile it is inappropriate for a court to consider the advantages of a foster home in deciding whether a statutory ground for termination has been established, such considerations are appropriate in a best-interests determination." *In re Foster*, 285 Mich App 630, 635; 776 NW2d 415 (2009). During the pendency of the case, the children spent 635 days with the Ratzes, and they were supportive of the children and respondents while the children lived with respondents. Daycare workers observed that when the children were upset or were excited, they asked for the Ratzes rather than respondents, and the children were more outgoing and playful when around the Ratzes than respondents. This weighed in favor of termination.

The trial court found while respondents began attending individual counseling and working on their personal issues, respondents' inability to cooperate and unwillingness to engage in services aimed at teaching parenting skills posed a risk to the children. Respondents never demonstrated an ability to sustain a habitable home while the children were living there, and, ultimately, respondents could not be trusted to provide the children with the stability and permanence that they needed. PG was removed from respondents' care four times. By the time of the fourth removal, PG was almost four years old and had experienced a lifetime of being shuffled between respondents and the Ratzes. Respondent-mother proved incapable of safely parenting and disciplining the children as they got older. While we acknowledge that respondents' issues do not include substance abuse and did not amount to violence against their children, the inadequate home environment they created for their children, and their failure to feed, bathe, or provide their children with clean clothes, presented significant safety and health issues and amounted to neglect. On this record, we find no clear error in the trial court's findings that termination would provide the children stability and permanence, as well as a clean, safe environment to live.

## IV. REASONABLE EFFORTS

Lastly, respondents argue that DHHS did not make reasonable efforts to reunify respondents with their children. In the absence of aggravated circumstances, DHHS must make reasonable efforts at reunifying children and parents. *In re Simonetta*, 340 Mich App 700, 707-708; 987 NW2d 919 (2022). DHHS's obligation only extends to efforts that are reasonable, not necessarily everything conceivable. See *In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017) (DHHS is not obligated to modify services to the point of fundamentally altering those services) and *In re Terry*, 240 Mich App 14, 27-28; 610 NW2d 563 (2000) (DHHS is not obligated to accommodate a parent with full-time live-in assistance). Furthermore, while DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered" and to benefit from those services. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Critically, even if a parent requires some accommodations, the parent must ultimately show that the parent can meet the child's needs. *In re Terry*, 240 Mich App at 24-28.

Respondents argue that DHHS failed to make reasonable efforts for two reasons, both of which are unsupported by the record. Respondents first argue that DHHS set them up to fail because caseworkers refused to accommodate respondent-father's busy work schedule. Respondent-father was understandably distrustful of DHHS caseworkers—his therapist testified he was traumatized as a child by CPS involvement in his family home. And he expressed many

times throughout the record that he was trying his best, caseworkers only testified about the negative aspects of his parenting and home life, and he believed DHHS was working against him. But caseworkers testified they tried to accommodate his schedule many times, only for respondent-father not to show up. DHHS offered services to respondents for any time of day and any day of the week, and respondents often cancelled, terminated services early, or did not reschedule services. They also appeared disinterested during at-home services, and their inability to implement the parenting and housekeeping skills was evidenced by their home continuing to fall back into an unclean and unsafe environment for the children. Respondents did not put in necessary effort in the family services required to achieve reunification accounting for their distrust of DHHS caseworkers.

Respondents next argue that DHHS filed a termination petition in retaliation for respondent-father's emotional outbursts. Neither respondent asserted in the trial court that the termination petition was punitive or retaliation for an outburst, so this issue is unpreserved. *Wells v State Farm Fire & Cas Co*, 509 Mich 855 (2022). Unpreserved issues are reviewed for plain error affecting a respondent's substantial rights, meaning any error must be obvious and must have affected the outcome of the proceedings. *In re Sanborn*, 337 Mich App at 258. Respondents are correct that DHHS was moving toward closing the case, but DHHS needed to establish a safety plan first. Respondent-father, instead of working with DHHS, became so combative and argumentative that establishing a safety plan became impossible. DHHS workers testified they sought termination because they believed respondent-father's behavior posed a risk to the children. Also at that time, the condition of respondents' house was deteriorating again. People who had been ordered to vacate the house were still living there and improperly watching the children while neither respondent was present, respondents' relationship with each other appeared to be unhealthy and even possibly violent, and, ultimately, respondents demonstrated the same behavior they displayed at the outset of the case by being uncooperative with DHHS workers and declining the services they were being offered. As the trial court found, DHHS provided respondents with more than reasonable efforts at reunification—caseworkers personally cleaned the house with respondent-mother, and offered to do it again multiple times. DHHS made reasonable efforts to keep the family together, but respondents did not make meaningful progress.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark T. Boonstra
/s/ Adrienne N. Young

-15-